ESTATE OF MARKOFSKE: QUANTIUS and another, Appellants, v. COTTER and others, Respondents.

*No. 295. Argued June 4, 1970.—Decided June 26, 1970.*
(Also reported in 178 N. W. 2d 9.)

770

For the appellants there were briefs by *Orth, Riedl & Orth* of Milwaukee, and oral argument by *Charles A. Riedl.*

For the respondent Charles M. Cotter there was a brief by *Boardman, Suhr, Curry & Field,* attorneys, and *Thomas G. Ragatz* of counsel, all of Madison, and by *Francis W. Murphy* of Portage, and oral argument by *Mr. Ragatz.*

CONNOR T. HANSEN, J.   Appellants' initial argument is that the county court lacked subject matter jurisdiction because (1) the petition dated July 30, 1969, was a petition in the alternative of the three wills executed by Catherine Markofske, and (2) the petitions of May 14, 1969, and July 30, 1969, failed to set forth sufficient facts to state a cause of action or special proceeding under sec. 310.10, Stats., and therefore the county court failed to acquire subject matter jurisdiction.

As to the first argument, *i.e.*, that a petition cannot be in the alternative, respondent-petitioner added the 1959 and 1960 wills in the alternative at the order of the trial court. Thus, the question is whether the trial court judge abused his discretion in proceeding in this manner. In *Will of Kalskop* (1938), 229 Wis. 356, 281 N. W. 646, 282 N. W. 587, only one will was offered for probate, but the trial court passed on the validity of two others as well.

". . . . May the court, where upon the trial it appears that there are other wills, bring all interested parties before it and make a final determination as to the validity of other wills in order to determine whether the testator died testate or intestate? Upon the return day of the order to show cause no contention was made that the whole matter had not been thoroughly and exhaustively tried. Counsel made no claim that they had not had sufficient time to prepare and present any and all evidence available with respect to each of the three wills.
". . . .
"It is considered that in controversies of this kind it is a matter well within the discretion of the trial court to determine how it will proceed. Separate trials which would amount merely to having the evidence offered and received on the first trial again presented to the court might well exhaust a moderate estate. Separate trials certainly could accomplish no useful purpose. It is possible that under some circumstances it might be an abuse of discretion for a trial court to reach out and determine the validity of a prior will where execution

was separated by a period of years instead of days. Each case must stand upon its own facts. In this case all of the parties were before the court, all of the evidence bearing upon the mental competency of the testator and his susceptibility to undue influence was before the court; all parties interested were summoned, and they were given an opportunity to present any additional evidence if any there was. None was offered nor was it contended that any such existed. It is considered therefore that the trial court proceeded in accordance with the principles laid down in the *Burns Case.* . . ." *Will of Kalskop, supra,* pp. 361 and 364.

The procedure followed by the trial court in the present case is within the latitude established in *Kalskop,* and, therefore, there was no abuse of discretion by the trial court.

Appellants' second argument centers on the nature of subject matter jurisdiction.

"Jurisdiction of the subject matter is the power to hear and determine cases of the general class to which the proceedings in question belong; the power to deal with the general subject involved in the action; and means not simply jurisdiction of the particular case then occupying the attention of the court but jurisdiction of the class of cases to which the particular case belongs, the authority to hear and determine both the class of actions to which the action before the court belongs and the particular question which it assumes to determine. 'Jurisdiction over the subject-matter' means the nature of the cause of action and relief sought, and such jurisdiction is conferred by the sovereign authority which organizes the court and is to be sought for in the general nature of the court's powers or in the authority especially conferred on the court. . . ." 21 C. J. S., *Courts,* pp. 36, 37, sec. 23.

However, appellants are in error when they argue that subject matter jurisdiction is dependent upon the sufficiency of a petition or pleading.

"Jurisdiction of the subject matter is essential in every case. Such jurisdiction the court acquires by the

act of its creation, and possesses inherently by its constitution; and it is not dependent on the existence of a good cause of action in plaintiff in a cause pending before the court; nor upon the sufficiency of the bill or complaint, the validity of the demand set forth in the complaint, or plaintiff's right to the relief demanded, the regularity of the proceedings, or the correctness of the decision rendered." 21. C. J. S., *Courts*, p. 45, sec. 35.

In this state, the county court is the proper judicial body to hear a petition for probate. The deceased died in Marquette county and all her property was also within that county. Sec. 253.10, Stats. The respondent-petitioner, Charles M. Cotter, was a nephew and named beneficiary and executor in each of the three wills offered for probate. Sec. 310.045 (2). Therefore, the jurisdiction of the county court of Marquette county was properly invoked.

### Presumption of revocation.

The initial issue determined by the trial court was that testatrix was presumed to have destroyed the 1965 will:

*"Eighth:* That the deceased did have in her possession, the last will dated February 17, 1959, the last will dated April 30, 1960 and the last will dated June 17, 1965; that the deceased knew the contents of the various last wills and was faced with a dwindling estate, and therefore, is presumed to have destroyed the last will dated June 17, 1965 and the last will dated April 30, 1960."

As to the 1965 will, the trial court found that the presumption of revocation had not been overcome; that the will was not destroyed by accident; and that there was no evidence to support a finding that the instrument should be allowed as a lost will and thereupon denied the admission of the will to probate as a lost will.

We consider this case to present a question of whether the trial court was in error in holding that the 1965 will was presumed to have been destroyed. The trial court also made the same finding as to the will of April 30,

1960. Since the material facts are not in dispute, the issue is one on which this court can rule as a matter of law. *Will of Donigian* (1953), 265 Wis. 147, 60 N. W. 2d 732.

In *Will of Donigian, supra,* pages 151, 152, this court reviewed three cases in which the presumption of destruction had been considered:

"In *Estate of Lambert* (1948), 252 Wis. 117, 31 N. W. (2d) 163, the testator made a will on March 16, 1946, and it was last seen in his possession. He died two weeks later and the will was never found. In the interval he told several people how he had disposed of his property. We held that the presumption of revocation which arises from nonproduction of a will is not so strong in this state as to require the proponent to prove that the testator had no opportunity to destroy the will, and we said (p. 126):

" 'The evidence of the proponent, having established that the deceased made a will and persisted in statements of satisfaction with its contents up to the day of his death, is sufficient to sustain the finding of the trial court that the presumption of destruction was overcome.'

"In *Wendt v. Ziegenhagen* (1912), 148 Wis. 382, 134 N. W. 905, the testator made his will in 1900. He died in 1909. He had possession of the will but it was not found after his death. His son who would profit by an intestacy and his widow, who sided with the son, had access to his papers. The court did not consider the question of the possible destruction of the will by interested parties but rested its decision upon the frequent statements of the testator to the effect that he was satisfied with his will and the absence of any change in conditions which would make it likely that he would revoke the will in order to give greater benefits than the son had already received. Such evidence was held to be sufficient to overcome the presumption and to support a finding that the testator did not destroy his will with intent to revoke it.

"In *Will of Lauburg* (1920), 170 Wis. 502, 175 N. W. 925, the testatrix up to the time of her death made declarations tending to show the existence of her will and that she had no intention of revoking it. We held that this evidence was strong enough to rebut the presump-

tion and support a finding that the will had not been destroyed by the testatrix with intention of revoking it."

In *Will of Donigian, supra,* page 154, the presumption of revocation was rebutted:

"We conclude that undisputed testimony here is sufficient to support a finding that the August 7th will was not revoked by the testator by destruction or otherwise. There is no testimony whatever that he did so revoke it,—nothing but a presumption that he did so arising from the nonproduction of the will,—and that presumption went out of the case when evidence came in that during Donigian's final days he referred to his will with satisfaction, that no change of intent was ever manifested, or cause for such change arose, and that his papers and effects were so situated that others than himself had access to them."

In this case, testatrix entered a convalescent home in September, 1967, and did not again live in the residence she owned prior to that time. The residence was sold in December, 1967, and the furniture, papers, files and other personal belongings were moved to the home of the testatrix's sister, Ann Cotter. Mrs. Cotter testified that at the time her sister's home was vacated, she found negotiable bonds under some newspapers and also found some stock certificates. These were put into the testatrix's safety-deposit box by Mrs. Cotter. Mrs. Cotter also testified that she made a search among all the papers, files and insurance policies of the testatrix which were in her possession but she had been unable to find a will; and that she didn't know of anyone other than herself, her son, Charles M. Cotter (respondent-petitioner), or attorney Francis Murphy who would have any papers or personal effects of her sister. Mrs. Cotter also testified that the testatrix had informed her that her son, Charles M. Cotter, was the executor of a will, and that the testatrix told her this at the death of the testatrix's husband in 1964 and again about four or five months before her death.

Charles M. Cotter testified that he did not make any search for the lost will. Attorney Francis Murphy, a witness and scrivenor of the 1965 will, and Wallace Krueger, the other witness, both testified that the original will was executed back near the vault in the Montello State Bank. Their testimony reflects the will was properly executed. Mr. Murphy conformed the copy of the will in the bank after the original was signed. At that time testatrix removed her original will of April 30, 1960, from the lock box in the bank which Mr. Murphy advised her to destroy since she had now signed another will. That was the last time Attorney Murphy discussed the will of June 17, 1965, with her, or saw the original 1960 or the original 1965 wills, and he had no idea as to what had ever been done with them. Wallace Krueger, the other witness, did not know anything about the whereabouts of the original will subsequent to its signing on June 17, 1965.

A comparison of the three wills shows little substantive difference between them, except as to Lyle McGwinn (a nephew of testatrix's husband), and certain comparatively small specific beneficiaries. The 1959 will left the testatrix's estate to her husband and in the event he predeceased her it provided for certain specific bequests of $500 and her personal belongings, and bequeathed the remainder to Charles M. Cotter, Betty Hanson and Lyle McGwinn. The 1960 will contained substantially the same provisions as the 1959 will, added some specific bequests totaling $450 and left the remainder of her estate to Charles M. Cotter and Betty Hanson to share equally. The 1965 will made no substantive changes in any of its provisions as compared with the 1960 will, except that the provision for her husband, who died in 1964, was not included. There was, therefore, little reason for the testatrix to revoke the 1965 will in the belief she could revive an earlier will.

Most of the personal goods of the testatrix were not in her possession for almost two years before her death.

She did not have her bonds and stock certificates with her, and the fact that negotiable bonds were found under newspapers leaves an inference that the testatrix did not make suitable provision for the safekeeping of her important papers. In addition, testatrix made reference to her will four or five months before her death and this fact, coupled with the complete absence of any evidence of intent to revoke or dissatisfaction with the 1965 will, or evidence of destruction, also goes to rebutting the presumption that the lost 1965 will was destroyed with the intention of revoking it.

Finally, no provision was made for the testatrix's sister, Ann Cotter, in any of the three wills. Mrs. Cotter did not contest the admission of any of the wills, nor is there any evidence that she did not make a diligent search for the 1965 will. Nevertheless, her interests would be furthered if no will were found and this is another factor which lessens the impact of the presumption of revocation in this case.

"We consider, further, that the very existence of the presumption we have been discussing depends on the tacit assumption that a diligent search was made for the will by persons trying to find it. We are far from charging that the contestant and his associates did not search in good faith and there is no evidence but what they did; but whatever virtue the presumption created by a failure to find may start with, that virtue is seriously diminished when it must depend on a search made by those whose interests will be impaired by production of the will. As we said in *Gavitt v. Moulton* (1903), 119 Wis. 35, 49, 96 N. W. 395:

" 'True, the mere fact that the contestant had an opportunity to destroy the will would not of itself overcome the presumption that it was destroyed by the testator with the intent to revoke it; still it is a circumstance to be considered with other proof.' " *Will of Donigian, supra,* pages 153, 154.

Therefore, (1) the absence of any testimony that testatrix was dissatisfied with the will, destroyed it, or that she intended to revoke; (2) evidence that she did not

have control of her personal papers and files for nearly two years prior to her death; (3) reference by testatrix to her will four or five months before her death; and (4) the manner in which testatrix kept her other important papers such as stocks and bonds, is sufficient to rebut the presumption and support the conclusion that the June 17, 1965 will was not revoked by the testatrix by destruction or otherwise.

Sec. 310.10, Stats., requires that the petition for probate of a lost will set forth the provisions of the will, which was done in this case by appending a copy of the June 17, 1965 will to the petition. In their brief, appellants state: "It is established that Catherine Markofske properly executed the will of June 17, 1965 as a valid will, and the same was last known to be in her possession." Therefore, the statutory requirements for execution of a will having been met and the presumption overcome, we are of the opinion that the 1965 will should be admitted to probate.

#### Dependent relative revocation.

The trial court held that the 1965 and 1960 wills had been destroyed by the deceased, intending thereby that the February 17, 1959 will would be the last will admitted by the court to cover the distribution of her property. Appellants argue that the doctrine of dependent relative revocation was the basis of the trial court's decision and that the doctrine is not applicable to this case. Respondents contend that if this court finds the presumption of revocation is not overcome, then the doctrine is applicable but that the trial court erroneously applied the doctrine and the 1965 will, and not the 1959 will, should have been admitted to probate.

The court has previously applied the doctrine of dependent relative revocation.

". . . This court is committed to the doctrine of dependent relative revocation. *Estate of Eberhardt* (1957), 1 Wis. (2d) 439, 85 N. W. (2d) 483, and *Estate of Cal-*

*lahan* (1947), 251 Wis. 247, 29 N. W. (2d) 352. The usual situation for application of this doctrine arises where a testator executes one will and thereafter attempts to revoke it by making a later testamentary disposition which for some reason proves ineffective. In both the *Eberhardt* and *Callahan Cases,* however, the doctrine was applied to the unusual situation in which a testator revokes a later will under the mistaken belief that by so doing he is reinstating a prior will. In this unusual situation, the doctrine of dependent relative revocation is invoked to render the revocation ineffective. . . ." *Estate of Alburn* (1963), 18 Wis. 2d 340, 342, 118 N. W. 2d 919.

Since this court finds that the 1965 will was validly executed and not revoked or otherwise ineffective, it is not necessary to further consider the doctrine of dependent relative revocation.

We conclude that the presumption of revocation of the 1965 will was overcome and the cause is remanded to the trial court with directions to vacate the order admitting the 1959 will to probate and to proceed with the administration of the estate after admitting the 1965 will to probate as the last will and testament of the decedent.

*By the Court.*—Judgment reversed and cause remanded to the trial court with directions. No costs to be awarded on appeal.